STATE OF MAINE                          SUPERIOR COURT
PENOBSCOT, ss.                          CIVIL ACTION
                                        DOCKET NO. CV-2018-_____

| | | |
|---|---|---|
| **MARK ROBSON,** | ) | |
| of Hampden, County of Penobscot, | ) | |
| State of Maine, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| **SHAW'S SUPERMARKETS, INC.,** | ) | |
| a Massachusetts corporation with a place of | ) | |
| business in Bangor, County of | ) | |
| Penobscot, State of Maine, | ) | |
| | ) | |
| Defendant | ) | |

Plaintiff Mark Robson complains against the defendant, Shaw's Supermarkets, Inc., as follows:

<u>PARTIES</u>

1.      Plaintiff Mark Robson is a citizen of the United States and a resident of Hampden, Maine.

2.      Defendant Shaw's Supermarkets, Inc., is a corporation duly organized under the laws of the State of Massachusetts and was, at all relevant times, engaged in business activities in the State of Maine employing over 500 employees.

<u>FACTUAL ALLEGATIONS</u>

3.      Plaintiff Mark Robson was hired by Shaw's in 1976 and most recently held the position of Store Director managing Shaw's retail store in Ellsworth, Maine.

4.     Throughout his employment by Shaw's, Mark performed his duties in a satisfactory and, at times, exemplary manner and consistently received positive performance evaluations.

5.     In March, 2013, Albertson's LLC purchased Shaw's.  At that time, Mark was the Store Director of Shaw's Bangor, Maine, location.

6.     Under the new management, Maine Store Directors were instructed to schedule employee work hours in their stores to equal the labor money each store was being allocated. Stores in Maine were routinely given labor money allocations that were 10%-20% lower than stores of comparable size and volume in other market areas of Shaw's.  Sometimes the labor allocation for a given week would be further reduced in the middle of that week to compensate for the poor performance of stores in other market areas.  Store Directors were told to cut employee hours but make sure to meet or exceed the required standards.

7.     The new management team also instituted a merchandising standard that every Maine store was required to meet:  the so-called "GOLD" (Grand Opening Look Daily) standard. Store Directors were told that, although their stores were required to meet the GOLD standard, and were given additional objectives to meet by the new management, no additional labor could be used over and above the designated amount.  Employee overtime was not permitted without the approval of the District Manager.

8.     If the company had an unprofitable period, labor money allocations would be reduced during the next period in an attempt to make up the shortfall in margin dollars or gross profit dollars.  The merchandising standards, however, did not change and overtime was strongly discouraged.  To meet the labor allocations, Store Directors were strongly encouraged / expected

to donate their Paid Time Off (PTO) to the store's labor money allocation. This would allow the Store Director to add labor dollars equal to the total value of their donated time.

9.      These demands often required Mark, as Store Director, to work through the night and on weekends and holidays in order to complete the eleventh-hour edicts from the new management. The expectations required him to repeatedly miss days off and to cancel planned vacations with his family.

10.     In spite of these demands, when Mark's store in Bangor was inspected by the District Manager, on June 18, 2013, Mark was told he was doing a "great job." His store was designated as one of the two best stores the District Manager had visited.

11.     Mark's longest stretch without a day off was in October - November, 2013. He worked a total of 39 days in a row without a single day off. Mark requested, through his District Manager, that the company provide him with another employee to cover the store so he could take some needed time off. His request was denied, and he ultimately forfeited multiple weeks of vacation that year. It became common for Mark to work 7-10 days in a row without a day off.

12.     When Mark informed his District Manager that he had been made to work 39 days in a row, the District Manager replied, "You signed up for this job."

13.     It was common for the District Manager to call Mark on his day off and ask him questions about the store's condition. When Mark responded that he would have the Assistant Manager look into it, the District Manager said, "Don't you want to see your own store in person?" After those calls, Mark would return to work on his day off.

14.     In addition, Mark frequently received two to three calls per day from management with new requirements that he was told had to be implemented immediately. It was common for Store Directors to get 11th hour edicts which required them to change the schedules of multiple

store employees, as well as their own.  For example, Store Directors would be told on a Friday that every store needed to empty its grocery, dairy, and frozen food back rooms and reorganize and update the inventories of all back stock items by Sunday morning.  They were told to take pictures of the final product and send their pictures directly to the Grocery Specialist teams. They were also told that no overtime could be used to accomplish these tasks.

15.     In the Fall of 2013, Mark called the Human Resources Manager on two separate occasions to ask whether the expected donation of PTO time by Store Directors to meet their labor money allocation was legal.  Mark was simply told that PTO time earned by the Store Directors could be donated back to their respective stores.  After Mark's second call, the HR Manager told him not to bring the issue up again.

16.     After this, certain members of management began contacting Mark more frequently during off hours about issues at his store over which he had minimal or no control. For example, one evening he got a text from a Grocery Specialist asking why there were so few cars in the store's parking lot at that particular moment.  Mark was expected to respond to those calls day and night.  If he failed to respond immediately he would be publicly chastised by the District Manager on conference calls or in meetings with other managers and Store Directors.

17.     In 2014, management began refusing to pay Mark's mileage expenses for work-related travel.

18.     In 2014, management began scheduling visits to Mark's store around holidays, which forced him to work on those holidays.  Then, after Mark had changed his schedule to accommodate the edict from management, management would cancel the visit at the very last minute.

19.     In a conference call with market area Store Directors in April, 2014, the District Manager told the Store Directors that the practice of donating their PTO time to their stores' labor allocation money was against company policy and that any Store Director who did so would face discipline, up to and including termination.  The District Manager said the company had been unaware the practice was going on.

20.     After this call, Mark called the District Manager directly and told him he had spoken to the HR Manager twice about this expected practice and was told it was a permissible practice.  The District Manager did not respond to Mark during this call.

21.     In June, 2014, Mark was given a performance review, not by his District Manager, but by a Grocery Specialist.  The Grocery Specialist wrote and delivered every Store Director's review for the prior fiscal year.  This was not standard operating procedure.

22.     Mark's store was thereafter closely monitored not just by members of management but by the spouses of managers.  For example, in September, 2014, the District Manager's wife, who was an employee of an outside vendor of Shaw's, visited Mark's store.  She told him he was one of the last Store Directors she had met because "It seems like you are always on vacation."

23.     On occasions when the District Manager's wife visited Mark's store she would submit an expense report for her mileage to the store's Service Desk.  When Mark learned of this practice he thought it was potentially fraudulent and perhaps illegal.  He called the HR Manager to complain about the practice and asked for a copy of Shaw's Whistleblower Protection Policy.  The HR Manager, Sandy Gilson, thanked him for the information and hung up.  Instead of taking his concerns to Loss Prevention or senior management, however, Ms. Gilson went directly to the District Manager, Michael Houser, whose wife had been implicated.  When Mark learned of this

he asked again about Whistleblower Protection and was told by Ms. Gilson that this would require her to contact the corporate human resources department, and she had made the decision to handle it one-on-one with Mr. Houser.   She told Mark she thought the issue had been sufficiently addressed.

24.     Not long afterward, the District Manager's wife began making "spot" inspections of Mark's store, often appearing after the District Manager had given Mark a list of "concerns." She would call her husband to report on the condition of Mark's store, and her husband, Mr. Houser, would then contact Mark to discuss his progress or alleged lack of progress at the store.

25.     The wife of a Grocery Specialist also monitored Mark's store, reporting to her husband on store conditions and customers.  The Grocery Specialist in turn relayed his wife's reports to the District Manager, who would then contact Mark with questions and action items. Mark was told by several Shaw's employees that the Grocery Specialist wanted to become the Store Director of the store Mark was then managing.

26.     In October, 2014, the Store Directors attended a meeting convened by the District Manager.  At the meeting Mark asked if Store Directors would be given any input into future budgets for their individual stores.  The District Manager responded, "No."

27.     After the meeting, the District Manager approached Mark and asked him why he was the only Store Director who ever asked any questions.  The District Manager asked if Mark was asking these questions on behalf of the entire District or only for himself.  The District Manager then told Mark that anyone calling Mark on any subject should talk directly to the District Manager instead.

28.     A few days after this conversation, the District Manager called Mark to tell him he was getting ready to walk into the Augusta store, and that he was planning to visit Mark's

store that coming weekend. Not more than five minutes later, the District Manager walked through the front door of Mark's store.

29. In November, 2014, Mark received a personal email from the District Manager informing him he had failed to meet his labor budget. On a conference call a few days later with all of the market area Store Directors, the District Manager singled Mark out, saying, "I am not sure what happened to Mark."

30. During a visit to Mark's store by the Bakery Specialist in 2014, the Specialist asked Mark, "Why is he so hard on you? He doesn't treat any other Store Director like that."

31. In June, 2015, a management team came to Mark's store to complete an inspection. When Mark asked whether he should walk with them, a Grocery Specialist told Mark not to join them, and that they would call him if they needed him. The District Manager arrived at Mark's store and subsequently left the store, along with the inspection team, without ever talking to Mark. Mark called the District Manager, who was in his car enroute to another store location, on the District Manager's cell phone. The District Manager told Mark he would return when Mark "had time for him." During this call, the District Manager made a number of demeaning and untruthful statements about Mark and the condition of his store.

32. After this call Mark phoned the Human Resources Manager, Sandy Gillson, and complained that Mr. Houser's behavior was uncalled for and unprofessional. She said it might be due to some difficult decisions Mr. Houser was having to make.

33. After visiting one of Mark's sister stores, the District Manager returned to Mark's store. Mark asked if he could speak to him privately. The District Manager replied, "I'm not going to apologize to you." The District Manager then followed Mark into the Loss Prevention office, where he told Mark that Mark had purposely avoided him that morning. Mark denied

this.  The District Manager then turned to Mark and said, "Why are you still here?"  He criticized Mark's contributions to the store and to the District.  Mark said he had no intention of leaving, but if the District Manager thought Mark could no longer contribute as a Store Director, the District Manager should terminate him.  Mark said, "Until that happens, I will continue to give you 150% of my effort."  At this point the District Manager repeated, "Why are you still here?"  Mark told the District Manager he had no intention of quitting.

34.     The Bangor store inspection was then completed and the store passed the inspection.  The District Manager, however, gave Mark a long list of tasks to be completed within one week.

35.     After the District Manager left Mark's store, Mark called the HR Manager and told her he felt he was being set up and targeted for harassment.  He told her he had documentation to back up his claim and she responded, "I am sure you do."

36.     At the end of June, 2015, Mark was transferred from the Bangor Shaw's to the Shaw's store in Ellsworth.  The Ellsworth store is over 30 minutes further from Mark's house in Hampden than the Bangor store.

37.     The District Manager continued to belittle and harass Mark at, seemingly, every opportunity.  He often belittled and demeaned Mark in front of others, although he never gave Mark a written warning or a list of corrective actions that Mark could take. The District Manager often visited Mark's store on Mark's day off to question Mark's Assistant Store Director in an effort to go around Mark and undermine his credibility.

38.     Shortly after the transfer to Ellsworth, the District Manager emailed Mark to chastise him over the Ellsworth store's "stock availability score."

39.     In August, 2015, a Grocery Specialist visited the Ellsworth store on Mark's PTO day off and criticized its condition.  The District Manager later called Mark to tell him he was responsible for the store's "horrendous" condition, and to accuse Mark of "setting up" his Assistant Store Director to fail.  He told Mark that if Mark had not taken the day off to be with his sick daughter, he would have called him into the store immediately to fix the issues that the Grocery Specialist had identified.

40.     In September, 2015, after Mark, at management's request, had completed Grocery Department inventories at two other District stores in addition to running his own store, the District Manager sent Mark an email stating that Mark had "cost the district $2,000 for the week" in labor costs.

41.     In October, 2015, the District Manager and a corporate team visited the Ellsworth store.  In a meeting following this inspection, the District Manager accused Mark of not supporting his Assistant Store Director.  The District Manager said, "I am not going to allow you to do to this store what you did to Main Street," a reference to the Bangor store.  Mark responded, "You mean deliver double-digit sales growth three years in a row?"  The District Manager said, "No, I was talking about the cleanliness standards.  With the size of this store and the amount you are spending each week in labor, this store should look like the Taj Mahal every day."  Another member of the corporate team asked Mark why he was taking notes because he was "not going to use them for anything."  The District Manager said, "Talk is cheap and results are the only thing that matter."  The District Manager asked Mark if he had worked on his day off, because, with the current condition of the Ellsworth store, he should have.

42.     In November, 2015, Mark sent his Assistant Store Director and four department managers from the Ellsworth store to the Bangor store to help Bangor get ready for a visit from

"corporate." The Ellsworth store was not on the list of stores to be visited that day. On the day of the visit, the District Manager texted Mark to ask if the Ellsworth store was ready for inspection. Mark responded that his store was not ready because it was not on the list, and he had sent five of his employees to Bangor to help at that location. The District Manager said Mark could expect a visit at 5:00 PM and that Mark "must have a lot to do before we arrive." At 5:45 PM the District Manager texted Mark to say corporate would not be visiting the Ellsworth store that evening. One of the Ellsworth department managers said to Mark that such behavior "is not right. They are abusing you."

43.     On January 21, 2016, the District Manager's wife visited the Ellsworth store and walked the entire store, evaluating its conditions.

44.     On January 25, 2016, Mark requested PTO time from March 24-29, 2016. The District Manager refused his request, saying "Easter is like Christmas, it's a blocked-out week." Mark subsequently called the HR Manager and asked for the list of blocked-out weeks for 2016. He was told there is no such list.

45.     The harassment Mark experienced was a single, interconnected pattern of conduct by Mark's supervisors in retaliation for the questions he asked and the concerns he raised about a number of company practices.

46.     Upon information and belief, other Store Directors and Shaw's employees over the age of 40 were subjected to similar harassment and subsequently left the company. Although, at the time of the changeover in management, several of the existing Store Directors received lower scores on their evaluations, the reduction in scores disproportionately impacted older managers. During a performance review on June 27, 2014, Pat Doak, who had been delegated responsibility for conducting Mark's performance review by the District Manager, said

it was a difficult assignment because "it is awkward to write reviews for the 'old guys.'"  When Mark challenged some of the low scores given to him by Mr. Doak, Doak responded, "Mark, it is what it is.  You're going to retire soon anyway."

47.     The unreasonable demands described above were targeted against Mark and other older employees because of their age in an effort to force them to resign their employment.

48.     On February 5, 2016, Mark suffered a medical emergency at work when he suddenly felt lightheaded, woozy, and unwell.  He sought medical attention and his provider advised him not to work.  For the next several months, Mark's medical providers sought to determine the cause of his medical issues.  During the summer of 2016, Mark's medical providers determined that he had suffered and was suffering from Post-Traumatic Stress Disorder related to the work environment at Shaw's.

49.     On April 20, 2016, Mark gave Shaw's Human Resources Manager a note from his medical provider stating that Mark would be away from work recuperating until August 20, 2016.  Mark requested an extension of his leave under the Family Medical Leave Act ["FMLA"], 29 U.S.C. § 2601 *et seq.*, to that date.

50.     On May 23, 2016, Mark received a letter from Shaw's stating that his 10 weeks of FMLA leave had been exhausted and his position would be permanently filled.  Shaw's never provided an explanation as to why it could not continue Mark's leave for an additional three months while maintaining his position for him.

**ADMINISTRATIVE PROCEDURE**

51.     On or about November 29, 2016, and as amended on or about October 13, 2017, Mark filed an employment discrimination complaint against Shaw's with the federal Equal Employment Opportunity Commission ["EEOC"] and the Maine Human Rights Commission

["MHRC"] alleging age discrimination, retaliation for complaints about age discrimination, and whistleblower retaliation.

52.　　Mark received a Right to Sue letter from the Maine Human Rights Commission on October 24, 2017, a true copy of which is attached as Exhibit A.

53.　　Mark received a Right to Sue letter under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, from the EEOC on October 30, 2017, a true copy of which is attached as Exhibit B.

54.　　Mark has complied with the procedural requirements of 5 M.R.S. § 4622 and 42 U.S.C. § 2000e-5.

## JURY TRIAL DEMAND

55.　　In accordance with M.R. Civ. P. 38(b), Mark demands a trial by jury of all issues triable to a jury.

## COUNT I

### (Whistleblower Retaliation)

56.　　Mark repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

57.　　By virtue of the foregoing, Shaw's intentionally discriminated against and retaliated against Mark with respect to his compensation, terms, conditions, and privileges of employment in violation of the Maine Whistleblowers' Protection Act, 5 M.R.S. §§ 831-40, and the Maine Human Rights Act, 5 M.R.S. §§ 4551 – 4634.

58.　　As a direct and proximate result of Shaw's violation of Mark's rights under the Maine Whistleblowers' Protection Act and the Maine Human Rights Act, Mark has suffered damages, including lost wages and benefits, and is continuing to suffer professional and personal

injuries, including lost wages and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

WHEREFORE, plaintiff Mark Robson prays for judgment against the defendant, Shaw's Supermarkets, Inc., and for the following relief:

(a) Declaratory relief that Shaw's engaged in unlawful whistleblower retaliation against Mark;

(b) Injunctive relief requiring Shaw's to reinstate Mark to the position of Store Director in Bangor, Maine, and to desist from all unlawful harassment, retaliation, or discrimination, and to provide effective training to all managerial employees in Shaw's northeast region on the laws prohibiting whistleblower retaliation in employment;

(c) Back pay for lost wages and benefits and prejudgment interest thereon and reinstatement to employment, or, in lieu thereof, front pay for future lost wages and benefits;

(d) Compensatory and punitive damages in amounts to be determined at trial by the jury, and prejudgment interest thereon;

(e) Full costs, including reasonable attorneys' fees and expert fees; and

(f) Such further relief as the nature of the case may require.

## COUNT II

### (Age Discrimination)

59. Mark repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

60. By virtue of the foregoing, Shaw's discriminated against and retaliated against Mark with respect to the terms, conditions, and privileges of his employment because of his age in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a and the Maine Human Rights Act, 5 M.R.S. §§ 4551 – 4634.

61. As a direct and proximate result of Shaw's intentional discrimination against Mark, he has suffered and will continue to suffer damages, including but not limited to lost wages and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, injury to career, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

WHEREFORE, plaintiff Mark Robson prays for judgment against the defendant, Shaw's Supermarkets, Inc., and for the following relief:

(a) Declaratory relief that Shaw's violated Mark's statutory civil rights to be free of age discrimination;

(b) Injunctive relief ordering Shaw's to provide effective civil rights training for all managerial employees in Shaw's northeast region on the requirements of all applicable laws prohibiting employment discrimination, and to desist from unlawful discrimination, harassment, and retaliation;

(c) Back pay for lost wages and benefits and prejudgment interest thereon, and, in lieu of reinstatement to employment, front pay for future lost wages and benefits;

(d) Compensatory and punitive damages in amounts to be determined by the jury and prejudgment interest thereon;

(e) Full costs, including reasonable attorneys' fees and expert fees; and

(f)     Such further relief as the nature of the case may require.

## COUNT III

### (Disability Discrimination)

62.     Mark repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

63.     By virtue of the foregoing, pursuant to the Maine Human Rights Act at 5 M.R.S. §§ 4551 *et seq.*, and the Americans with Disabilities Act at 42 U.S.C. §§ 12101 *et seq.*, Shaw's is liable to Mark for disability discrimination.

64.     As a direct and proximate result of Shaw's disability discrimination, Mark has suffered and will continue to suffer damages, including but not limited to lost wages and benefits, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, deprivation of professional and career opportunities, and other pecuniary and non-pecuniary losses.

WHEREFORE, plaintiff Mark Robson prays for judgment against the defendant, Shaw's Supermarkets, Inc., and for the following relief:

(a) Declaratory relief that Shaw's engaged in unlawful disability discrimination against Mark;

(b) Injunctive relief ordering Shaw's to require affirmative training and other steps to reduce the likelihood of similar unlawful discrimination in the future and order Shaw's to cease all unlawful discrimination;

(c) Back pay for lost wages and benefits, prejudgment interest on back pay and benefits, and front pay for future lost wages and benefits;

(d) Compensatory and punitive damages in an amount to be determined at trial and prejudgment interest thereon;

(e) Full costs, including reasonable attorney fees and expert fees; and

(f) Such further relief as the nature of the case may require.

## COUNT IV

### (Family Medical Leave Act Retaliation)

65.    Mark repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

66.    Shaw's retaliated against Mark for the exercise of his rights under the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, by failing to restore Mark to his position following the termination of his FMLA leave and by deterring Mark from exercising his rights under the FMLA.

67.    Shaw's discriminated against Mark when it constructively discharged him in retaliation for the exercise of his FMLA rights in violation of the FMLA.

68.    Shaw's violation of the FMLA was not made in good faith and Shaw's did not have reasonable grounds for believing its actions were consistent with the FMLA, entitling Mark to liquidated damages.

WHEREFORE, plaintiff Mark Robson prays for judgment against the defendant, Shaw's Supermarkets, Inc., and for the following relief:

(a) Declaratory relief that Shaw's engaged in unlawful retaliation against Mark;

(b) Injunctive relief ordering Shaw's to reinstate Mark to the position of Store Director and desist from all unlawful harassment, retaliation or discrimination, and to provide

effective training to all managerial employees in Shaw's northeast region on the laws prohibiting retaliation for the exercise of employees' rights under the FMLA;

(c) Back pay for lost wages and benefits and prejudgment interest thereon and reinstatement to employment, or, in lieu thereof, front pay for future lost wages and benefits;

(d) Compensatory and punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(e) Liquidated damages;

(f) Full costs, including reasonable attorneys' fees and expert fees; and

(g) Such further relief as the nature of the case may require.

## COUNT V

### (Maine Family Medical Leave Requirements Retaliation)

69.     Mark repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

70.     Shaw's retaliated against Mark for the exercise of his rights under the Maine Family Medical Leave Requirements ["FMLR"], 26 M.R.S. §§ 843 *et seq.*, by failing to restore Mark to his position following the termination of his FMLR leave and by deterring Mark from exercising his rights under the FMLR.

71.     Shaw's discriminated against Mark when it constructively discharged him in retaliation for the exercise of his FMLR rights in violation of the FMLR.

72.     Shaw's violation of Mark's FMLR rights was willful, entitling him to additional liquidated damages.

WHEREFORE, plaintiff Mark Robson prays for judgment against the defendant, Shaw's Supermarkets, Inc., and for the following relief:

(a) Declaratory relief that Shaw's engaged in unlawful retaliation against Mark;

(b) Injunctive relief ordering Shaw's to reinstate Mark to the position of Store Director and desist from all unlawful harassment, retaliation or discrimination, and to provide effective training to all managerial employees in Shaw's northeast region on the laws prohibiting retaliation for the exercise of employees' rights under the FMLR;

(c) Back pay for lost wages and benefits and prejudgment interest thereon and reinstatement to employment, or, in lieu thereof, front pay for future lost wages and benefits;

(d) Compensatory and punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(e) In the absence of an award of wages, salary, benefits or other compensation denied or lost, order Shaw's to pay liquidated damages of $100 to Mark for each day the violation has continued.

(f) Additional liquidated damages;

(g) Full costs, including reasonable attorneys' fees and expert fees; and

(h) Such further relief as the nature of the case may require.

Dated at Bangor, Maine, this 19th day of January, 2018.

MARK ROBSON

By _____

William B. Devoe, Esq.
Bar Registration No. 2764

By     _Adria LaRose_____

Adria Y. LaRose, Esq.
Bar Registration No. 4976

EATON PEABODY
80 Exchange Street
P.O. Box 1210
Bangor, Maine 04402-1210

Attorneys for Plaintiff



# Maine Human Rights Commission
# 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*

**Amy M. Sneirson**
EXECUTIVE DIRECTOR

**Barbara Archer Hirsch**
COMMISSION COUNSEL

**October 24, 2017**

Mark Robson
91 Main Trail
Hampden, ME 04444

OCT 2 6 2017

RE:     NOTICE OF RIGHT TO SUE, Issued upon Complainant's Request
          CHARGE NO: E16-0506

To The Person Aggrieved:

More than 180 days have expired since the filing of this charge. This is your NOTICE OF RIGHT TO SUE issued pursuant to 5 M.R.S. §4612, sub-§6 and §4622, sub-§1, ¶C. It is issued at your request. If you intend to sue the Respondent(s) named in your charge, you must do so within two (2) years of the act of unlawful discrimination complained of in your charge or within 90 days of the issuance of this letter, whichever is later.

With the issuance of this NOTICE OF RIGHT TO SUE, the Commission is terminating its process with respect to this charge.

An information copy of this NOTICE OF RIGHT TO SUE has been sent to the Respondent(s) shown below.

On Behalf of the Commission,

*Amy M. Sneirson*

**Amy M. Sneirson**
Executive Director

cc:     **SHAW'S SUPERMARKETS INC**
          K Joshua Scott
          Sarah E. Newell

**EXHIBIT**

**A**

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Mark Robson<br>91 Main Trail<br>Hampden, ME 04444 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

OCT 30 2017

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|
| EEOC Charge No. | EEOC Representative | | Telephone No. |
| 16B-2017-00189 | Amon L. Kinsey, Jr.,<br>Supervisory Investigator | | (617) 565-3189 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☐ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☒ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
#### (See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Kenneth An*

**Feng K. An,**
**Area Office Director**

OCT 26 2017

(Date Mailed)

Enclosures(s)

cc:

**SHAW'S SUPERMARKETS INC**
**Brian P Fitzsimmons**
**750 W Center Street**
**West Bridgewater, MA 02379**

**Sarah E. Newell**
**EATON PEABODY**
**80 Exchange Street**
**PO Box 1210**
**Bangor, ME 04402**



**EXHIBIT**

**B**

Enclosures(s)

cc:   **K Joshua Scott**
      **JACKSON LEWIS ATTORNEYS AT LAW**
      **100 International Drive, Suite 363**
      **Portsmouth, NH 03801**