# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| MARK ROBSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-cv-00055-LEW |
| | ) | |
| SHAWS SUPERMARKETS INC, | ) | |
| | ) | |
| Defendant | ) | |

## ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Mark Robson alleges his employer, Shaw's Supermarkets, Inc., intentionally discriminated and retaliated against him by engaging in whistleblower and family-medical-leave retaliation (Counts I and IV) and age discrimination (Count II), and failing to accommodate a disability (Count III), in violation of federal and state law. Complaint (ECF No. 1-1). Defendant moves for summary judgment on all claims. Defendant's Motion for Summary Judgment (ECF No. 26).

For the reasons discussed herein, Defendant's motion is granted in part and denied in part.

## SUMMARY JUDGMENT FACTS

The summary judgment facts are drawn from the parties' stipulations, if any, and from their statements of material facts submitted in accordance with Local Rule 56. The Court will adopt a statement of fact if it is admitted by the opposing party and is material

to the dispute. If a statement is denied or qualified by the opposing party, or if an evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference. D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018).

The plaintiff, Mark Robson, began his employment with Shaw's in September 1976 as a bag boy and stock boy. In May 1995, Shaw's promoted Robson to the position of Store Director, and Robson remained a store director through February 5, 2016, the date on which Robson took leave under the Family Medical Leave Act.

In March 2013, Albertson's Companies, LLC, purchased Shaw's from Supervalue, Inc. The purchase came on the heels of a Shaw's reduction in force of approximately 700 employees in 2012. Robson, at the time, was 56 years of age. Under Albertson's ownership, Shaw's underwent a dramatic change in management style and store directors were instructed to be consistently dissatisfied with everything they saw, and informed that no matter how good they were, they could do better. Albertson's implemented the Grand Opening Look Daily Standard, or "GOLD" standard, which meant that all stores were expected to modify merchandising and the way the store looked to meet the quality standards that Albertson's, expected from every store, every day. The general idea was that a store should perpetually look the same as it did at its grand opening. Albertson's

provided each Shaw's store with a weekly labor budget, and afforded store directors the leeway to spend the labor budget as they saw fit, provided they did not exceed the budget, but Albertson's did not give store directors a role in determining the appropriate labor budget. How well a store director utilized the labor budget was a performance factor that could be reviewed and rated by upper level management. Following Albertsons' purchase of Shaw's in March 2013, the number of hours worked by store directors increased noticeably given the expectation that stores obtain a higher standard expending fewer labor dollars. For Robson, these demands often required that he work through the night and on weekends and holidays to complete the eleventh-hour edicts from the new management. The expectations required him to repeatedly miss days off and to cancel planned vacations with his family.

Sometime in or around April 2013, David Singleton, then District Manager in Maine, visited all the stores in the district, including Robson's store in Bangor, Maine, and provided each store director with a punch list of things to complete to improve the store and meet the GOLD standard. In June 2013, Singleton told Robson that he was doing a great job and was one of the two best that Singleton visited. In October 2013, following a meeting between Robson and his Assistant Store Director, Jeff Moulton, Moulton went on a leave of absence and did not return to work. Robson remained without an assistant until March 2014, because Singleton did not fill the position even though the store was one of the highest volume Shaw's stores in Maine, and during that period Robson worked as many as 39 consecutive days without taking a day off. When Robson raised a concern with the district labor manager, he was informed that Singleton chose not to find coverage for him.

When he reported to the Regional Human Resources Manager (Ms. Gilson) that he considered the lack of support to be detrimental to his health, the HR manager did not offer any solution. When he brought the matter up with his future district manager (Michael Houser), the only response was that Robson had signed up for the job.

In November or December 2013, Singleton and Shaw's District Labor Manager, Michael Rapa, encouraged store directors to voluntarily increase their store labor budgets by donating their personal paid time off to the store. Many store directors, including Robson, did so, though there were others who refused to donate their paid time off. From the end of November 2013 to January 2014, Robson donated between sixty and eighty hours to his store's labor budget, though in December 2013 Robson reported to Sandra Gilson, Shaw's Regional Human Resources Manager, that he considered the practice unethical. Evidently, Robson was not the only store manager to voice a concern. Ms. Gilson then relayed the matter to Brian Fitzsimmons, Director of Labor Relations and Employment Law. Mr. Fitzsimmons advised Gilson that there was no policy against it, but the practice should not be encouraged. Gilson followed up with Robson in mid-December 2013 and informed him that because it is the store director's time, the individual can decide whether to donate it or not. In January 2014, Robson again complained about the matter and asked Gilson to raise the matter once more. Gilson said she would, but when Robson called her a week or two later, she advised him not to bring the matter up again. After January 2014, Robson made no further donation of his paid time off.

In January 2014, District Manager Singleton did not return from vacation. Patrick Doak, then a "Center Store Specialist," filled in as an acting district manager until March

2014, when Michael Houser took over as the district manager for Maine. In this timeframe, Robson received a text from Doak asking him why there were so few cars in his store's parking lot. This is one example of communications from management, in the off hours, concerning matters that Robson had little or no control over, but to which he felt obligated to respond. Doak and Houser visited Robson's store within the first few weeks of Houser's tenure as district manager. During the visit, Houser stated that Robson's store was not the "shit show" Doak told him it was. Robson was familiar with Doak's criticism of his store and felt Doak's concerns were petty.

In 2014, Robson experienced one or more holidays in which management would schedule a visit to his store during the holiday, then cancel the visit at the last minute. Meanwhile, Robson would have canceled holiday plans to be present for the store visit. Houser also announced to store directors that taking more than two weeks of vacation in one year was excessive. Robson earned seven weeks of paid time off annually.

In April 2014, Houser informed store directors that it was against policy to donate paid time off toward the labor budget. Additionally, Houser would confront Robson about his labor and CSI scores in calls, texts, and emails. (In group emails, Houser was critical of other store directors, as well.) In November 2014, Robson told Houser that Doak was in his store, daily, taking pictures to embarrass and ridicule him. Houser acknowledged that Doak wanted to run the Bangor store.

In June 2014, Robson received his annual review for the period from February 2013 through February 2014. Mr. Doak conducted the review of Robson (and other store directors) because Stapleton was no longer with the company and Houser had not been a

supervisor in that period. Mr. Doak stated that he considered it a tough assignment to review the "old Shaw's guys" he previously worked with. Doak gave Robson an average/standard review, and Robson expressed dissatisfaction. Doak stated, "Mark, it's not a big deal. You're going to retire soon anyway." Robson had not told anyone he intended to retire soon. Robson told Doak that he was burning bridges, needed to be more flexible, and should not let Albertson's make him a monster. The comments upset Doak to the point of tears. Later, Robson spoke with Gilson about the matter and she agreed with him that it was improper for Doak to conduct the review without Houser's participation, given that Doak was once more a grocery specialist rather than a store director.[1]

In September 2014, Doak delivered to Robson a collection of Robson's past mileage reimbursement requests, extending back to April 30, 2014, and he informed Robson that his requests would not be honored. This was a deviation from store policy.

At a store directors meeting in October 2014, Robson asked if store directors would have any input into future budgets for their stores, to which Mr. Houser responded, "No." After the meeting, Mr. Houser asked why Robson was the only store director asking questions and whether he was asking on behalf of others. He informed Robson that store directors with questions should come to him directly, not channel their inquiries through Robson.

---

[1] Doak was a "center store specialist," had served temporarily as acting district manager, and had formerly been part of Mr. Singleton's team. Doak would also serve as labor manager in 2015.

In November 2014, Mr. Robson contacted Ms. Gilson and informed her that Mr. Houser's wife, who worked for a Shaw's vendor and was not an employee, was requesting and receiving mileage reimbursement from several stores, including his store. Robson had spoken to other store directors and they corroborated that she was receiving mileage reimbursement at their stores, as well. Robson understood that such requests were against company policy and he suspected wrongdoing. Robson told Ms. Gilson that he felt he would need whistleblower protection for reporting what he believed was a violation of company policy.

Gilson spoke with Mr. Fitzsimmons about the issue and he advised her that Mrs. Houser, as a vendor, should not be receiving mileage reimbursement through the stores but instead should be going through proper channels. Robson followed up with Gilson approximately a week later and she informed him that she had addressed the issue "one on one" (rather than through a loss prevention report) and Mrs. Houser would no longer be receiving mileage reimbursement. When Robson expressed concern about retaliation, stating, "Now, how do I get whistleblower protection?" Gilson explained that Mr. Houser was not informed who brought the matter to her attention.

"Not long after" he reported Mrs. Houser's mileage reimbursements, Mrs. Houser started to appear in Robson's store, often after District Manager Houser had presented him with a list of concerns. Robson attests that Doak's wife would also monitor his store and that Houser would contact Robson with questions and action items based on her and Mrs. Houser's observations. At some point, Houser instructed Robson not to advise other store directors if they called him for direction, and to instead direct them to Houser.

On November 20, 2014, Houser sent an email to his team in which he complained that eight stores were over their labor budgets and that he wanted responses, felt they had just disregarded his instructions, and were being insubordinate. On November 26, 2014, Houser sent an email to his team of store directors praising them for a great day of sales, with sales up by over 16% for the day. In the email, after noting that 18-19 stores were "positive," he commented, "Not sure what happened to Mark?" Robson says that beginning in early 2015 he would receive calls from Houser four or five times a week and was told he was dragging down the district.

In anticipation of store visits scheduled for June 17, 2015, Robson called and asked to be the first store visited, due to a personal appointment, but neither Mr. Houser nor Mr. Doak responded to Robson's request that day and he, therefore, cancelled his personal appointment. Ultimately, nobody showed up that day to conduct the review and nobody responded to his request. Robson's store was inspected the next day, instead. On the day of the store visit, Robson and Houser did not meet during the initial store review, and when Robson called Houser later that day, Houser suggested Robson had not made time for him, which was not a fair characterization, and then proceeded to badger Robson and told him they would meet in person later that day. When Houser returned to Robson's store, Houser expressed some additional, unspecified unpleasantness. Houser then turned to Robson and said, "Why are you still here?" Robson responded that he was working until 5:00. Houser stepped forward and said, "No, why are you still here?" He criticized Robson's contributions to the store and to the district. Robson said he had no intention of leaving, but if Houser thought Robson could no longer contribute as a store director, he should

8

terminate him. Robson said, "Until that happens, I will continue to give you 150% of my effort." Houser responded by saying that Robson's "time had come and gone" and that "no one looked up to [Robson] anymore." Houser concluded by telling Robson, "If you share this with anyone I will deny it."

On July 6, 2015, Robson was transferred from the Bangor store to the Ellsworth store. However, his transfer was one of several resulting from another store director's retirement (i.e., four other store directors also changed stores and Doak obtained his first position as store director, in Dover-Foxcroft). Robson also received the option to transfer to Dover-Foxcroft, but he chose Ellsworth. Shaw's historically rotates its store directors every three to five years and Robson had been at the Bangor store for almost five years. Within days of his transfer to the Ellsworth store, Houser was criticizing Robson concerning the store's stock.

On August 21, 2015, while away from the store on paid time off for a daughter's medical procedure, Robson received a call from his assistant store director who reported that Houser was in the store. Houser called Robson later that day and complained about the condition of the store and said he would have called Robson in but for the daughter's procedure.

In September, 2015, Houser faulted Robson for costing the district $2000 in labor expenses, after Houser had recently completed grocery department inventories at two other stores at the request of management. On September 15, 2015, Robson received a performance appraisal from Mr. Houser with an overall score of 3.333 out of 4.

In October 2015, Mr. Houser and Mr. Martel toured the Ellsworth store, after which Houser met with Robson in the store's office. Houser yelled at Robson regarding an issue with the assistant store director that allegedly occurred during the prior week when Robson was on vacation. Houser complained about the cleanliness of the store and the two-week vacation Robson had just taken. At his deposition, when describing the incident, Robson testified that Houser "would not let an opportunity to badger, harass or torment any store director slip through his fingers" and "[i]f there was going to be a conversation with any store director, it was going to turn negative very, very quickly." Robson Dep. 191 – 92 (ECF No. 27-1). Robson now objects to his testimony, asserting that he can only speak from his personal experience. Robson later called Houser to voice the opinion that Houser lacked the professionalism one would expect of a district manager.

On October 13 and 14, 2015, Houser sent emails to Robson and other store directors complaining that they had exceeded their labor budgets and that Robson and one other director were also "both running down in sales" that week. He asked, "Was I not clear or did you just decide to ignore me? Either case will not be tolerated."

In November, 2015, Robson sent his assistant store director and four department managers to help prepare the Bangor store for a scheduled visit, as his Ellsworth location was not scheduled for a visit. Houser texted Robson to say that he could expect his own visit that evening, at 5:00 p.m., but then texted at 5:45 p.m. to state that the visit would not occur.

In January, 2016, Robson emailed Houser to request paid time off during Easter and Houser indicated he believed that Easter, like other holidays, was "blocked out." Robson

had, the previous year, asked for vacation time after Easter, recognizing that holiday vacation time was discouraged for store directors. Robson revised his 2016 request for another time, and it was granted. On January 21, 2016, Houser's wife walked through the entire Ellsworth store.

On February 5, 2016, Robson and other store directors received a text sent on behalf of Houser. The text included an image of the Super Bowl display Houser expected would be created in each store. Robson understood that each store director would respond with an image of the same display set up in their respective stores, within an hour or two. Robson also knew he did not have the display materials on hand. This experience left Robson unable to concentrate or gather his thoughts, and he left work to meet with his primary care medical provider. Thereafter, Robson received counseling and medication to address significant mental health symptoms. With his wife's assistance, Robson filed a request for FMLA leave, which Shaw's approved.

On April 20, 2016, Robson provided Shaw's with a note from his provider stating Robson would be recuperating until August 20, 2016. The provider also wrote, "He is to return to work based on the evaluation of his medical team." Robson asked for an extension of his leave until that date.

Robson's twelve weeks of FMLA leave expired on April 30, 2016. In a letter dated May 23, 2016, Shaw's notified Robson that his FMLA leave was exhausted and because he was "unable to return to work for the foreseeable future," it was "necessary at this time to permanently fill your pre-leave position." Robson Dep. Ex. 8 (ECF No. 27-9). Shaw's also wrote that Robson was still an employee, and when he was released to return to work

in any capacity, Shaw's would work with him to identify vacant positions he was qualified to perform, with or without reasonable accommodation. In his July 2019 response to Shaw's motion, Robson admitted that he has not been cleared to work since February 5, 2016, and he testified at deposition in 2019 that there is no way he could return to work in retail at Shaw's, even though Houser is no longer the district manager. Robson Dep. 230. Shaw's decision to fill Robson's position and classify him as out on continuing leave was not unique to Robson; Shaw's takes this approach as a matter of policy.

On May 24, 2016, Ms. Gilson wrote to Robson to report that she would be leaving Shaw's and to wish him well. She advised him to "do whatever you have to do to care of you [sic] and don't worry about coming back to Shaw's." She also stated, "It seems to getting [sic] harder and harder to make people happy." Robson Aff. Ex. D (ECF No. 34-4).

Between May 1, 2013, to June 19, 2018, Shaw's employed a total of forty individuals to work as store directors in its 22 stores in Maine. Of those forty individuals, twenty ceased working at Shaw's during this period. Ninety percent of the store directors who ended their employment at Shaw's (i.e., 18 of the 20) were over forty years-old. However, the record does not indicate who among them quit and who was fired. Of the three store directors who were under the age of 40, two separated from employment during this period.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com*, *Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in his favor. *See Triangle Trading Co. v. Robroy Indus*., *Inc*., 200 F.3d 1, 2 (1st Cir. 1999) ("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case.").

Plaintiff argues the record will support claims for violation of federal and state family medical leave law, disability-accommodation law, and anti-age-discrimination law. These claims are capable of discussion based on federal law; Plaintiff has not argued that state law is more favorable and, therefore, I will focus my analysis on the federal statutes and precedent. Plaintiff also advances a whistleblower-retaliation claim that is available exclusively under state law.

### A. Family Medical Leave

Employees covered by the Family Medical Leave Act are entitled to take up to 12 weeks of qualifying leave in any one-year period. Employees who take FMLA leave are also entitled to be restored to the same position or an equivalent position upon return from leave. *Hodgens v. Gen. Dynamics Corp*., 144 F.3d 151, 159 (1st Cir. 1998). "[A]n

employee is not entitled to reinstatement under the FMLA if he is unable to return to work until after the expiration of his leave." *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 424 (1st Cir. 2014) (citing 29 C.F.R. § 825.216(c)).

Defendant filled Plaintiff's position after the expiration of his FMLA entitlement, and in doing so it acted within its rights. Indeed, Defendant could have filled the position during Plaintiff's 12-week period of protected leave. *Green v. New Balance Athletic Shoe, Inc.*, 182 F. Supp. 2d 128, 137 (D. Me. 2002) ("The FMLA allows an employer to replace an employee who has taken a FMLA-qualifying leave, provided that the employer reinstates the employee to an equivalent position once she returns." (quoting 29 U.S.C. § 2614(a)(1)(B))).

The FMLA also provides that an employer may not discriminate against an employee who takes FMLA leave. *Hodgens*, 144 F.3d at 160. However, an employer acts within its rights if it terminates an employee who fails to return to work upon the expiration of FMLA leave, *Green*, 182 F. Supp. 2d at 140, as was the case here.

Defendant is entitled to summary judgment on Plaintiff's FMLA claims.

**B. Disability Accommodation**

Plaintiff contends the Defendant's decision to fill his position and not hold it open beyond the expiration of his FMLA entitlement was a failure to reasonably accommodate his disability. Pl.'s Obj. to Def.'s Mot. 25 ("Shaw's misapprehends the nature of Mark's disability claims. Mark contends that Shaw's … fail[ed] to accommodate him.").

The Americans with Disabilities Act (ADA) requires that employers provide "reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodations are modifications or adjustments to the work environment, or to the manner in which the position's duties are customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 84 (1st Cir. 2016) (citing 29 C.F.R. § 1630.2(o)). "In order to prove 'reasonable accommodation,' a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (footnote omitted). "An employer is obligated to provide a reasonable accommodation (as long as it is not unduly burdensome) where a protected employee has requested an accommodation or the employer otherwise knew that one was needed."[2] *Murray*, 821 F.3d at 84. However, "the ADA does not require an employer to reallocate job duties in order to change the essential function of a job." *Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 20 (1st Cir. 1998) (citation and quotation marks omitted).

To demonstrate a failure to accommodate, the plaintiff must show (1) he is a disabled person within the meaning of the ADA; (2) he is qualified to perform the essential

---

[2] "[A] request for a reasonable accommodation may trigger a responsibility on the part of the employer to enter into an interactive process with the employee to determine an appropriate accommodation." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004).

functions of the job, with or without reasonable accommodation; and (3) the employer knew of the disability but declined a request to provide a reasonable accommodation. *Sepúlveda-Vargas v. Caribbean Restaurants, LLC*, 888 F.3d 549, 553 (1st Cir. 2018).

In some cases, an employee's request for a period of leave could be considered a reasonable request for accommodation of a disability. *Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 128 (1st Cir. 2017); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000); *Willingham v. Town of Stonington*, 847 F. Supp. 2d 164 (D. Me. 2012). But the request for accommodative leave, like any other request for accommodation, needs to provide the employer with notice as to specifics of the accommodation, such as how it will enable the employee to perform the essential functions of the position. *Calero-Cerezo*, 355 F.3d at 23; *Reed*, 244 F.3d at 259. The request must also be "facially reasonable." *Echevarria*, 856 F.3d at 127.

Plaintiff argues he made a specific request for an accommodation consisting of a more than six-month period of leave. Assuming, for the sake of argument, that the request was, in fact, a specific request for an accommodation (it was not worded that way), a six-month period of disability leave is not reasonable under the circumstances of this case. *Cf. Echevarria*, 856 F.3d at 130 – 31 (collecting cases and also discussing rationale stated in *Hwang v. Kan. State Univ.*, 753 F.3d 1159 (10th Cir. 2014) (Gorsuch, J.)). The record demonstrates that the store director positions were demanding positions. Plaintiff has not attempted to make the case that Defendant could have gotten along fine without a store director for so long a period and I fail to see how a jury could infer that was the case. Additionally, Plaintiff's report of a need for prolonged leave reflected, if anything, his

incacity to perform the job for an indeterminate period, and given the importance of the position no reasonable juror could conclude that it was unreasonable for Defendant to fill the position. Finally, because Plaintiff never came back to revise the initial "request," there is no basis to fault Defendant for not engaging in the interactive process.

## C. Age Discrimination

Plaintiff alleges in his complaint that Defendant engaged in age discrimination in violation of Title VII of the Civil Rights Act. Compl. ¶ 60. In fact, Title VII does not prohibit age discrimination. *See* 42 U.S.C. § 2000e-2; *Gen. Dynamics Land Sys.*, *Inc. v. Cline*, 540 U.S. 581, 586 (2004) ("Congress chose not to include age within discrimination forbidden by Title VII of the Civil Rights Act of 1964 …."). Age discrimination in employment is prohibited in the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 – 634 (ADEA). Pursuant to the ADEA, it is unlawful age discrimination for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. *Id.* § 623. I will liberally interpret Plaintiff's complaint to assert a federal claim under the appropriate statute.

To demonstrate the existence of a trial-worthy case of age discrimination, a plaintiff must, ultimately, make an evidentiary showing that: (1) he was 40 or older; (2) his job performance met legitimate expectations; (3) the employer subjected him to an adverse employment action; and (4) age was the "but for" factor in the adverse employment action.[3]

---

[3] In a typical age discrimination case involving termination from employment, the plaintiff is called upon to make a prima facie showing of age-bias by showing that the employer filled the position with someone

17

*Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446 – 47 (1st Cir. 2009). The test to assess whether the summary judgment record raises genuine issues as to each of the required elements proceeds in stages. Initially, proof of "but for" causation is not the focus. Instead, the plaintiff initially must make a prima facie showing that he met the age requirement[4] when he was subjected to the adverse action, and that the decision to impose the adverse action at issue is somehow logically connected to age.[5] This customarily breaks down as requiring the plaintiff to show (1) membership in the protected age group; (2) satisfaction of the employer's expectations; (3) adverse employment action; and (4) differential treatment of others that who are similarly situated except as to the protected factor. *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 88 (1st Cir. 2018). *See also Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.*, 804 F.3d 127, 130 (1st Cir. 2015) (describing the final prima facie element as failure of the employer to "treat age

---

[4] "substantially younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."). Defendant has not suggested that the new store director who assumed Plaintiff's duties was not significantly younger than Plaintiff and I will presume that this element is satisfied. However, in this case Defendant did not terminate Plaintiff, so the adverse action element is not so simple.

[4] Under Maine law, a plaintiff does not need to be 40 or older to receive protection against age discrimination. *Maine Human Rights Comm'n on Behalf & Use of Trudel v. Kennebec Water Power Co.*, 468 A.2d 307, 308 (Me. 1983); 5 M.R.S. § 4572(1)(A).

[5] "As the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 – 12 (1996) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.7 (1981)).

neutrally in taking the adverse action"). Typically, satisfaction of the prima facie standard is a simple and straight-forward affair. *Rivera-Rivera*, 898 F.3d at 88.

If the employee makes the prima facie showing, then the burden shifts to the employer to produce evidence of a legitimate cause for the adverse treatment other than age-related bias. *Id.*; *Velez*, 585 F.3d at 447. If the employer fails in this regard, summary judgment is denied. But if the employer makes its showing, then the burden returns to the plaintiff, who must present evidence capable of supporting a reasonable inference that age was the but for cause for the adverse employment action, which evidence consists of both the evidence in support of the prima facie showing, and any additional evidence that can support a finding that the employer's stated justification is untrue and serves only as a pretext for discrimination. *Rivera*, 898 F.3d at 88; *Velez*, 585 F.3d at 447 – 48.

The parties do not dispute that Plaintiff met the age requirement for ADEA protection throughout the relevant period. The disputed issue concerns the existence of an adverse employment action. Defendant argues the record does not disclose that Plaintiff experienced an adverse employment action, Motion at 12 – 13, "harassment due to his age," *id.* at 15, or severe and pervasive harassment, *id.* Plaintiff responds that adverse employment action is demonstrated by a hostile work environment, a constructive discharge, threats of discharge, a disadvantageous transfer to the Ellsworth store, the denial of the mileage reimbursement, and actual discharge. Pl.'s Obj. at 16. Plaintiff also attempts

to reinforce his claim with statistical evidence, at least in paragraphs 120 – 122 of his statement of additional facts.

### 1. *Material adverse action*

A tangible and significant change in work terms and conditions can amount to an adverse employment action. Tangible employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus*., *Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Lee-Crespo v. Schering-Plough Del Caribe Inc*., 354 F.3d 34, 43 (1st Cir. 2003). In this category, Plaintiff points to termination, threats of termination, a disadvantageous transfer, and discontinuation of mileage reimbursement.

To begin, the record does not demonstrate that Defendant terminated Plaintiff. In fact, Plaintiff experienced a health event and stopped working. I, therefore, do not consider this case to present an outright termination scenario. As for the threat (or fear) of termination, that contention is better addressed as part of Plaintiff's hostile work environment theory.

The two remaining matters – the discontinuation of the mileage reimbursement and the transfer to the Ellsworth store – are, on the other hand, tangible impositions. But are they material to an inquiry focused on age discrimination?

The record does not support a natural inference that Defendant's failure to fulfill Plaintiff's mileage reimbursement requests related to Plaintiff's age. Plaintiff himself considered this treatment to be a reprisal for his opposition to allowing or encouraging store directors to donate paid time off toward store labor budgets and other

contemporaneous remarks he believes angered Mr. Houser and Mr. Doak.  Plaintiff bears the initial burden of developing the prima facie showing that permits the finder of fact to conclude that this treatment somehow reflects the employer did not treat age as a neutral factor when addressing mileage reimbursement requests.[6]

Finally, although the Ellsworth store transfer could perhaps be viewed as a material alteration in work conditions, no logical relation to Plaintiff's age is apparent, even for purposes of the light prima facie standard.  Store transfers are a periodic reality of the store director position.  It is undisputed that Shaw's moved its store directors every three to five years and that Plaintiff was at the Bangor store for nearly five years when the transfer came down.  There simply is no basis in the record to understand how someone could presume that Plaintiff's age was a factor (let alone the but-for factor) behind Plaintiff's transfer to Ellsworth, particularly as every store director in the area received a transfer.

In summary, if Plaintiff's age discrimination claim rested exclusively on so-called material adverse action, it would likely fail.  However, Plaintiff has a hostile work

---

[6]  Although I do not reach the issue, mileage may or may not be a "significant" tangible imposition.  The mileage requests pertained only to certain travel, not daily travel, and there is no information in the record to indicate the value of the mileage requests.  The Seventh Circuit has held, for example, that denial of discretionary reimbursements that are not part of an employee's salary do not rise to the level of adverse employment actions if the monetary sums are not significant.  *See Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001), *and compare Breneisen v. Motorola, Inc.*, 512 F.3d 972, 980 (7th Cir. 2008) (denial of tuition reimbursement treated as presumptively significant) *with Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001) (denial of $156.89 reimbursement not materially adverse).

environment claim that turns on the totality of the circumstances, which gathers up these impositions and others to be weighed by a different standard.

### 2. *Hostile work environment / constructive discharge*

The distinction between hostile work environment and constructive discharge is primarily a matter of remedies. In effect, to obtain an award of back pay and front pay after a retirement, a plaintiff needs to demonstrate that the retirement was, for practical purposes, involuntary and compelled, i.e., a "constructive discharge."[7] *Bodman v. Maine Dep't of Health and Human Servs.*, 720 F. Supp. 2d 115, 123 (D. Me. 2010). I do not need to consider remedies at this juncture. Because proof of a hostile work environment would suffice to overcome the summary judgment motion, and because the hostile work environment standard is less onerous than the constructive discharge standard, *id.*, I will assess whether Plaintiff's presentation raises a trialworthy hostile work environment claim.

The record, in this case, brings to mind the admonition that "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins." *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000). In particular, having a supervisor who expresses dislike and animosity, including undeserved criticism, but does so without imposing tangible adverse action, does not ordinarily rise to the level of an adverse employment action. *Bhatti v. Trustees of Bos. Univ.*, 659 F.3d 64, 73 – 74 (1st Cir. 2011). Even "extreme supervision" falls short. *Soong v. Bath Iron Works*, No. 2:18-CV-00297-

---

[7] "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)).

GZS, 2019 WL 2125834, at *3 (D. Me. May 15, 2019) (citing *Bhatti*, 659 F.3d at 73, and

*Marrero v. Goya of Puerto Rico*, *Inc*., 304 F.3d 7, 25 (1st Cir. 2002)). Anti-discrimination

law, in other words, is not an invitation for workers with a protected status to attempt to

impose a "general civility code" on overbearing managers. *Burlington N. & Santa Fe Ry.*

*Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs*., *Inc*.,

523 U.S. 75, 75 (1998)). However, where the employer has engaged in hostile conduct

reflecting a negative attitude toward protected status, that conduct is actionable where it

results in an abusive work environment, even in the absence of a tangible adverse

employment action. *Flood v. Bank of Am. Corp*., 780 F.3d 1, 10 (1st Cir. 2015).

In the *Perez-Cordero v. Wal-Mart Puerto Rico* (a case of sex discrimination under

Title VII), the First Circuit explained that this area of the law is not always subject to bright

lines, and I repeat what was written there, modifying the language to encompass age-

discrimination:

> "[Anti-discrimination law] affords employees the right to work in an
> environment free from discriminatory intimidation, ridicule, and insult."
> *Meritor*, 477 U.S. at 65. Nevertheless, harassment that does not directly
> result in tangible changes in employment – "hiring, firing, failing to promote,
> reassignment with significantly different responsibilities, or a decision
> causing a significant change in benefits," *Ellerth*, 524 U.S. at 761 – must be
> severe and pervasive enough to bring the complained-of conduct within [the
> law's] requirement that workplace … discrimination affects a "term,
> condition, or privilege" of employment. *See Meritor*, 477 U.S. at 69.
> ….
> We have said that "the hostility vel non of a workplace does not depend on
> any particular kind of conduct," *Billings*, 515 F.3d at 48 …, and that "[t]here
> is no precise formula for establishing sufficiently egregious conditions."
> *Rosario*, 607 F.3d at 246. Nor do particular factors that contributed to our
> finding a hostile work environment in prior cases set a baseline against which

future cases must be measured. *Accord Schiano v. Quality Payroll Sys.*, *Inc.*, 445 F.3d 597, 606 (2d Cir. 2006).

*Perez-Cordero v. Wal-Mart Puerto Rico*, *Inc.*, 656 F.3d 19, 29 (1st Cir. 2011) (*Billings* parenthetical comment omitted).

To be sufficiently egregious, i.e., to rise to the level of an abusive work environment, harassment must be severe or pervasive. Factors include the "severity of the discriminatory conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance." *Franchina v. City of Providence*, 881 F.3d 32, 46 (1st Cir. 2018); *see also Doyle v. Dep't of Human Servs.*, 824 A.2d 48, 56 (Me. 2003); *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 352 (D. Me. 2018). At summary judgment, a court must keep in mind that its task is merely to police the outer bounds of reasonable inference; not to assume the role of fact finder. *Rivera-Rivera*, 898 F.3d at 93.

While I recognize that Shaw's store directors are overwhelmingly members of the protected age group and that the record in this case does not depict a workplace pervaded with ageist intimidation, ridicule, and insult, Plaintiff's contentions regarding his June 17, 2015 interaction with Mr. Houser, if accepted as true, might be regarded by the finder of fact as the keystone in an arch of lesser indignities that, together, stack up to support Plaintiff's age-based, hostile work environment claim. The encounter described by Plaintiff involved not only ageist ridicule, but also insult that squarely called into question Plaintiff's ability to perform his job given his longevity. The finder of fact might not regard

the purported mistreated as severe, but the record nonetheless generates the issue. Defendant is not entitled to summary judgment on the age discrimination claim.[8]

### D. Whistleblower Retaliation

The Maine Whistleblower Protection Act (WPA), 26 M.R.S. §§ 831 – 840, prohibits employers from discharging, threatening, or otherwise discriminating against an employee who, in good faith, reports what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of the State of Maine, a political subdivision of the State of Maine, or the United States.[9] *Id.* § 833(1)(A). The WPA also prohibits, inter alia, discrimination against an employee who, in good faith, reports what the employee has reasonable cause to believe is a condition that puts at risk employee health or safety. *Id.* § 833 (1)(B). Under the WPA, adverse employment actions include threats. *Id.* §§ 833(1)(A), (B). A violation of the WPA is actionable under the Maine Human Rights Act (MHRA), 5 M.R.S. §§ 4572(1)(A), 4621.

To overcome a summary judgment motion, a plaintiff advancing a claim of whistleblower retaliation must make a showing that (1) he engaged in protected whistleblower activity, (2) experienced an adverse employment action, and (3) the circumstances suggest (prima facie) a causal connection between the whistleblowing and

---

[8] Plaintiff's statement of additional facts includes some "statistical" interpretation of a chart that lists store directors, provides their ages, and indicates whether they remain at Shaw's, but Plaintiff did not make any use of the statements in his summary judgment memorandum. The record reflects that Shaw's tends to hire store directors who are over 40 and, consequently, most store directors who leave are over 40. The chart reflects that there were eight store directors within five years of Plaintiff's age who remained employed at Shaw's when the chart was produced; two are older than Plaintiff and four are within three-years of Plaintiff's age. While this background may prove relevant at trial, I do not see how it materially advances Plaintiff's claim of age bias.

[9] "[T]o satisfy the reasonable cause requirement, the employee must report something other than an ordinary breach of an employment contract to bring himself within the provisions of the Whistleblower Protection Act." *Lee v. Town of Denmark*, 2019 ME 54, ¶ 10, 206 A.3d 907, 910.

the adverse action. *Brady v. Cumberland Cnty.*, 126 A.3d 1145, 1150 – 51, 58 – 59 (Me. 2015).

Plaintiff's whistleblower claim founders on the first element of the required showing. Plaintiff argues his acts of opposing voluntary contributions of paid time off and the payment of mileage to Ms. Houser were the product of his good-faith, reasonable belief that the practices were unlawful. I disagree. Although Plaintiff opposed practices that many might find objectionable, the practices were not mandated by Defendant and Plaintiff has not identified any positive law or rule prohibiting either practice. Because the record does not permit a finding that it was reasonable for Plaintiff to believe Defendant was acting unlawfully in regard to contributions of paid time off and the payment of mileage to a vendor, this evidence does not show protected whistleblower activity. *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154–55 (Me.1991) ("[T]he Maine Whistleblowers' Protection Act ... requires an employee to prove that a reasonable person might have believed that the employer was acting unlawfully.").

Plaintiff's remaining contention is that his complaints concerning his need for a store assistant could be considered whistleblower activity because he made some complaints out of concern for his health and safety. Plaintiff's subjective contention about the health and safety implication of working 39 consecutive days as a store director is not objectively reasonable. Furthermore, Plaintiff has not established that Defendant mandated

that Plaintiff refrain from taking time off until Defendant filled the vacant assistant position.

Plaintiff has not demonstrated that he engaged in whistleblower activity and Defendant is therefore entitled to summary judgment on the whistleblower claim.

## CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (ECF No. 26) is GRANTED IN PART and DENIED IN PART. Plaintiff's claims concerning family medical leave, disability accommodation, and whistleblower retaliation are hereby DISMISSED.

**SO ORDERED.**

Dated this 6th day of September, 2019

   /s/ Lance E. Walker
   U.S. DISTRICT JUDGE
